## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| McKESSON CORP., *et al*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civ. Action No. 82-220 (RJL) |
| | ) |
| ISLAMIC REPUBLIC OF | )     **FILED** |
| IRAN, *et al.*, | ) |
| | )     JUL 1 8 2007 |
| Defendants. | ) |
| _____ | )     NANCY MAYER WHITTINGTON, CLERK |
| | U.S. DISTRICT COURT |

## MEMORANDUM OPINION
(July __17__, 2007)

The McKesson Corporation ("McKesson"), has sued the Islamic Republic of Iran

claiming that the Iranian government expropriated its dividends and interests in an Iranian

dairy company, the Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy" or "Pak").  On

November 16, 2001, our Circuit Court remanded the case to this Court for: (1) a trial

regarding Iran's "come to the company" defense and McKesson's "futility" claim; and (2)

a reexamination of an earlier ruling by the original judge assigned to the case, Judge

Thomas A. Flannery, as to whether McKesson has a cause of action under the Treaty of

Amity.  After an additional period of discovery and several rounds of motions, this Court

held a bench trial between February 12 and March 2, 2007 and heard oral arguments

thereafter on the Treaty of Amity issue from both the parties and the United States.  Based

on the preponderance of evidence presented at trial, the Court finds: (1) that Iran failed to

establish that the Pak Dairy Board of Directors implemented a "come to the company"

requirement for the payment of shareholder dividends; and (2) even if they had established such a requirement, compliance by McKesson would have been futile.

In addition, after reviewing the extensive briefs and oral argument, this Court finds no basis to disturb Judge Flannery's earlier ruling that McKesson has a cause of action under the Treaty of Amity. Accordingly, the Court will issue an order reinstating *nunc pro tunc*, the judgment for McKesson filed by Judge Flannery on May 26, 2000 under customary international law, and award post judgment interest. Finally, the Court finds that McKesson, as the prevailing party, is entitled to reasonable attorney's fees and costs and will issue an order establishing a procedural framework within which to determine the appropriate amount of each.

## I. BACKGROUND

In March 1960, the McKesson Corporation and a group of Iranian investors joined to form Pak Dairy. McKesson provided capital and trained personnel, and until the Iranian Revolution, controlled Pak's Board of Directors and appointed the firm's managing director. In 1979, however, McKesson personnel at Pak fled the country during the Revolution and the Iranian government took control of Pak's Board of Directors. *McKesson Corp. v. Islamic Republic of Iran*, 1997 WL 361177 at *1 (D.D.C. June 23, 1997).

In 1982, McKesson sued Iran in this court alleging that Iran had expropriated its 31% interest in Pak and illegally withheld dividends declared in 1981 and 1982. In 1997,

2

after years of litigation and two appeals to our Circuit Court, Judge Flannery found Iran

liable for expropriation and granted McKesson's motion for summary judgment.[1]

*McKesson Corp. v. Islamic Republic of Iran*, 1997 WL 361177 at *12 (D.D.C. June 23,

1997).  Judge Flannery awarded McKesson more than $20 million in damages and later

awarded $2.9 million for attorneys' fees and expenses. *McKesson v. Islamic Republic of*

*Iran,* 116 F.Supp.2d 13 (D.D.C. 2000); Mem. Op., Nov. 30, 2000; Judgment, Nov. 30,

2000.

On appeal, Iran argued that Pak was justified in withholding McKesson's

dividends because McKesson had failed to appear, in person, to collect them, as required

by Iranian law (the so-called "come to the company" requirement).  In 2001, our Circuit

reversed Judge Flannery in part, concluding that there was a material issue of fact as to

whether the Pak Dairy Board had exercised its discretion to implement a "come to the

company" requirement with which McKesson had to comply and, in turn, whether

compliance by McKesson would have been futile. *McKesson HBOC, Inc. v. Islamic*

*Republic of Iran,* 271 F.3d 1101 (D.C. Cir. 2001).  Accordingly, the Circuit Court

remanded the case for trial on these two narrowly drawn issues. *Id.*  In a later opinion,

our Circuit Court ordered this Court, which in the meantime had been assigned to this

case, to reexamine Judge Flannery's decision that the Treaty of Amity provides

McKesson a cause of action in this Court. *McKesson v. Islamic Republic of Iran,* 320

---

[1] Judge Flannery found Iran liable both for expropriating McKesson's equity interest and for withholding the 1981 and 1982 dividends. *McKesson*, 1997 WL 361177 at *12.

F.3d 280 (D.C. Cir. 2003).

Pursuant to the Circuit Court's orders and after additional rounds of briefing and discovery, this Court held the first half of a six-week bench trial between February 12 and March 2, 2007 to hear the factual evidence regarding the defendants' "come to the company" defense and the plaintiff's "futility" claim.  The second half of the bench trial was scheduled for June 11, 2007 for whatever expert testimony might be necessary.  At the conclusion of the defendants' case, plaintiff moved for judgment pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.  The Court heard arguments, but decided to take the decision under advisement until after the plaintiff's presentation of its evidence regarding its futility claim.  At the conclusion of the plaintiff's case, the Court heard oral arguments on the Treaty of Amity issue on March 2 and March 20, 2007 from both the parties and the Department of Justice.  That issue was also taken under advisement.

On June 6, 2007, the Court informed the parties at a pre-trial conference that based on the evidence offered at the preceding bench trial, the applicable law and the record, it found that the defendant had not established by a preponderance of the evidence that the Pak Dairy Board of Directors implemented a "come to the company" requirement with which McKesson was bound to comply.  Furthermore, the Court announced its conclusion that it did not need to hear expert testimony before reaching this conclusion. Accordingly, the Court granted plaintiff's Rule 52(c) motion.

Additionally, the Court announced that based on the documentary and testimonial

4

evidence plaintiffs offered at trial, it had concluded that even if a "come to the company"

requirement had been implemented by the Pak Dairy Board, compliance with that

requirement by McKesson would have been futile.  Again, the Court disagreed with the

defendant as to its need to hear expert testimony prior to reaching this conclusion.

Accordingly, the Court announced that it saw no reason for the second half of the trial to

continue the following week and thus discontinued the trial.

Finally, having heard oral arguments from both the parties and the United States

on the Treaty of Amity issue, and having reviewed the exhaustive briefs submitted by

both, the Court announced its conclusion that it found no legal basis to disturb Judge

Flannery's earlier conclusion that the Treaty of Amity provides McKesson a cause of

action in this Court.

The following are the Court's findings of fact and conclusions of law in support of

its judgment for McKesson on the issue of liability and its right to sue under the Treaty of

Amity.

## II.  FINDINGS OF FACT

Although the history of this case is a long and somewhat tortured one, the

remaining factual issues to be decided by this Court are relatively narrow and discrete: did

the Pak Dairy Board of Directors choose to implement a "come to the company"

requirement and would compliance with that requirement have been futile.  Moreover,

both parties acknowledged at trial, Tr. 2/23/07 at 37:12-22; 2/26/07 at 38:9-13, that the

defendant has the burden of establishing, by a preponderance of the evidence, that Pak Dairy imposed this so-called requirement on McKesson.

In support of its claims, Iran presented four factual witnesses: Alyreza Dadyar ("Mr. Dadyar"), Mohammad Sanaie ("Dr. Sanaie"), Mohammad Hejazi Motlagh ("Mr. Hejazi"), and Hassan Tahmasebi ("Mr. Tahmasebi"), who testified via videotaped deposition. McKesson presented testimony from one live witness, Leonard M. Patterson Jr. ("Mr. Patterson") and the video taped depositions of Ali Vahdati ("Mr. Vahdati") and Nami Moshiri ("Mr. Moshiri"). All three addressed both the "come to the company" defense and McKesson's futility argument.

After reviewing the evidence offered at trial and evaluating the credibility— or lack thereof—of the witnesses, it is hard to imagine—to paraphrase Winston Churchill—that less evidence has ever delayed the awarding of so much, to one so deserving, for so long!

## A. THE "COME TO THE COMPANY" REQUIREMENT

At the outset it is important to note that Pak Dairy's Articles of Association (the "Articles") contain no reference, whatsoever, to a "come to the company" requirement. The Articles merely require that Pak's Board of Directors "determine the mode of payment of dividends" and that "dividends shall be paid within four months after resolution of [the] general meeting." Pl. Ex. 1, Art. 57. Moreover, none of the contemporaneous documents offered by Pak Dairy and admitted into evidence at trial

state that there was a "come to the company" requirement for shareholders in order to receive their dividends.  Indeed, Iran's own witness, Mr. Dadyar, an accountant at Pak Dairy[2] from 1968 to 2003, not only testified that he had never seen anything in writing from Pak Dairy regarding shareholders coming to the company to receive dividends, but acknowledged that the Articles contained no such requirement.  Dadyar Tr. 2/15/07 a.m. at 45:10-14.

Furthermore, there was virtual agreement among all of the witnesses who testified that as long as it controlled the Pak Dairy board, McKesson received its dividends in dollars via wire transfer pursuant to a procedure created in compliance with Iran's law for the Attraction and Protection of Foreign Investment.  Indeed, although Mr. Dadyar, Mr. Hejazi (a former employee of Pak Dairy for 17 years), and Mr. Tahmasebi (a Pak Dairy shareholder and a member of the Board of Directors) all testified that it was common practice for Iranian shareholders to present themselves, in person, to collect their dividends,[3] neither Mr. Dadyar, Mr. Hejazi, nor Mr. Tahmasebi testified that McKesson

---

[2] Mr. Dadyar served as the Chief Accountant at Pak Dairy for a number of years prior to his retirement in 2003.  The exact dates of his tenure, however, were never adequately established at trial.

[3] Mr. Dadyar testified that in order to receive their dividends, shareholders presented themselves to Pak Dairy's Shareholder's Department, provided proof of identification or a letter of introduction and then received a check for their dividends (in rials) in exchange for a signed receipt.  Dadyar Tr. 2/12/07 a.m. at 50:13-57:1.  Mr. Hejazi testified that he witnessed "local stockholders" appearing, in person, to collect their dividends.  Hejazi Tr. 2/21/07 a.m. at 52:19-53:7.  Mr. Tahmasebi testified that it was "normal practice" for shareholders to appear in person to collect their dividends and that he always did so to collect his own payments.  Tahmasebi Tr. 2/15/07 p.m. at 27:17-18; Tahmasebi Dep. 16:13-17:11.  None of Iran's witnesses testified that they were aware of a written requirement that shareholders appear at the company to receive their

was bound by this policy.  Moreover, Mr. Patterson (the former senior in-house lawyer at

McKesson who was responsible for handling legal issues in conjunction with the Pak

Dairy relationship) confirmed that at no time was a McKesson representative required to

present himself to the Shareholder Department in order to receive McKesson's payments.

Patterson Tr. 2/26/07 p.m. at 23:22 to 24:25.

Moreover, even after the Iranian government took control of Pak's Board of

Directors in 1980, there is no evidence that Pak chose to end McKesson's exemption

from this alleged "come to the company" requirement.  To the contrary, based on the

following evidence offered at trial, this Court concludes that Pak's refusal to pay

McKesson its dividends was the result of an Iranian government decision to prevent

capital flight out of the country, rather than McKesson's failure to abide by a supposed

"come to the company" requirement.

On May 21, 1980, after having failed to receive the dividends declared in 1979 and

1980, McKesson initiated the first of three direct demands to Pak Dairy for either

payment of its dividends or an explanation as to why its dividends would not be paid.  On

that date it sent Pak a letter requesting that its payment be deposited, in rials, in a bank

account in McKesson's name.  Pl. Ex. 39; Patterson Tr. 2/26/07 p.m. at 49:19-51:15.  Pak

refused to pay, informing McKesson on May 27, 1980 that:

> [D]ue to [the] decision and instruction of the Board of Directors, Pak Dairy cannot
> pay any sums of money for any reason to foreign shareholders.  So I cannot take

dividend payments.

any action on your request.

Def. Ex. 52; Patterson Tr. 2/26/07 p.m. at 52:10-53:2.  Shortly thereafter, on June 5, 1980,

McKesson responded by requesting that: "the Board of Directors communicate to us

directly their decision in this matter and express to us the legal basis for this denial."  Def.

Ex. 90; Patterson Tr. 2/26/07 p.m. at 55:5-25.  Notwithstanding this unequivocal

opportunity to set forth its supposed "come to the company" requirement, Pak

inexplicably refused to respond.  Patterson Tr. 2/26/07 p.m. at 56:1-3.[4]

     Undeterred, McKesson's representative on the Board of Directors, Mr. Vahdati,

made a formal written demand in March 1981 to Pak Dairy's Board of Directors for

payment of McKesson's dividends .  Pl. Ex. 60, ¶ 7; Vahdati Tr. 2/28/07 a.m. 9:23-24

[Vahdati Dep. 40:16-41:1].  That request was discussed at a meeting of the Board of

Directors on April 29, 1981, which Mr. Vahdati attended.  The Board, however, decided

at that meeting that McKesson would not be paid.  Pl. Ex. 61, ¶ 9; Vahdati Tr. 2/28/07

a.m. 9:23-24 [Vahdati Dep 43:15-44:21].  Curiously, the minutes of that board meeting,

do not mention a "come to the company" requirement as the basis of the Board's decision

to preclude payment.  Pl. Ex. 61, ¶ 9.  Instead, the Board decided to forward McKesson's

_____

[4] The Iran-United States Claims Tribunal, established pursuant to Executive Order 14,111 (1981) found that Iran had wrongfully withheld the 1979 and 1980 dividends which constituted a "serious infringement of McKesson's rights to enjoy the fruits of its holdings in Pak Dairy."  *McKesson*, 1997 WL 361177 at *2, quoting *Iran-United States Claims Tribunal Award in the Case of Foremost Tehran, Inc. v. Government of the Islamic Republic of Iran* (April 10, 1986).  Based on this finding, the Tribunal awarded McKesson approximately $900,000 in damages.  *Id.*

request to the International Committee on Financial and Legal Claims at Bank Markazi

(the Iranian central bank) as Mr. Vahdati confirmed in his testimony.[5]  *Id.*

Four months later, McKesson informed Pak by telex on August 26, 1981, that it

intended to submit its dividend claims to the Iran-United States Claims Tribunal (the

"Hague Tribunal") if a settlement was not reached by October 1981.  Def. Ex. 37.  Again,

rather than declaring that it was prepared to pay McKesson its dividends if it came to the

company to collect them, Pak replied by telex on September 28, 1981, that McKesson's

dividends had been credited to an internal account on the company's books and that the

company was considering whether to send representatives to Vienna to negotiate

McKesson's claims.  Def. Ex. 28.

On October 23, 1981, after multiple unsuccessful attempts to schedule settlement

negotiations with Pak Dairy, McKesson withdrew its representatives from Pak's Board of

Directors and demanded immediate compensation for the unpaid dividends (as well as its

expropriated equity interest).  Def. Ex. 32.  Pak's Board met three days later, on October

26, 1981, to discuss that demand.

During the bench trial, Iran contended, through the introduction of the testimony of

Mr. Dadyar and purported minutes of that meeting, that the Pak Board implemented a

"come to the company" requirement at that October 26, 1981 Board meeting and was

---

[5] Although Mr. Vahdati presented his claim to the Board of Directors rather than the Shareholders Department, the Court finds it hard to believe that Iran would have litigated this case for twenty five years because Mr. Vahdati made his request in the wrong office at Pak Dairy.

prepared to pay these dividends if McKesson complied with the requirement.  McKesson

not only disputed that the testimony and board minutes established that fact, but contested

the authenticity and trustworthiness of Iran's evidence.  For the following reasons, the

Court agrees with McKesson, and does not credit Iran's evidence as to what happened at

that Board meeting.

In support of its claim, Iran offered, through Mr. Dadyar, what it purported to be

the actual minutes of the October 26, 1981 meeting.  Def. Ex. 9, 9A.  Those minutes, *as

translated by Iran*[6], indicated that the Board had decided that the 1980 and 1981

dividends would be paid:

> within the legal time limit, to all shareholders, the payment of whose dividends are
> not barred by official sources.  It was also decided to credit the dividend of the
> foreign shareholders, like the previous years, to their account until they come to
> the company to collect it.

Def. Ex. 9; *see also* Hejazi Tr. 2/21/07 p.m. 4:17-5:8.

On voir dire, however, McKesson confronted Mr. Dadyar with another set of

signed minutes for the same meeting, held on the same date, at the same time, and in the

same place – which had been produced by Pak Dairy during discovery (Pl. Ex. 122 for

identification).  After reviewing those minutes, Mr. Dadyar admitted that the alternative

minutes were materially different from Def. Ex. 9A.  Dadyar Tr. 2/13/07 am at 56:1-20.

Among other things, he pointed out that there was no discussion in this additional set of

------

[6] McKesson has contested the accuracy of the Iranian translation of the minutes, but, for the sake of this analysis, the Court will assume *arguendo*, that the Iranian version is accurate.

minutes regarding payment of dividends, nor was there a counterpart to the "come to the company" language quoted above from paragraph 9 of Def. Ex. 9A.

Moreover, although the alternative minutes were signed by all of the Board members who were present, they had not been signed by Mr. Hejazi, who attended Board of Directors meetings as a non-voting observer, representing the Islamic Workers Council at Pak Dairy. Hejazi Tr. 2/22/07 am at 16:7-10, 25:15 [Hejazi Dep. 10:23-11:6]. When confronted about this discrepancy Mr. Hejazi insisted, nonetheless, that he was present during the meeting described in this second set of minutes, notwithstanding the fact that he had *denied* being present only moments earlier in his testimony. Hejazi Tr. 2/21/07 pm at 25:25 to 26:1-17. In any event he never explained why, if he had been present, he had not signed the alternative minutes, or why they do not, at least, record his presence.

Incredibly, Iran produced a third set of minutes purporting to describe this same October 26, 1981 meeting of the Pak Dairy Board (Def. Ex. 134 for identification). Although bearing the same meeting identification number, this third set of minutes reports the meeting starting at a different time (i.e.1:00 p.m), whereas the meeting described in the other two sets of minutes purportedly began at 9:00 a.m. on the same day and at the same location. Corcoran Tr. 2/20/07 pm at 21:21 to 23:1.

Iran's trial counsel attempted to account for the differences between these three sets of minutes by claiming that the two alternate sets of minutes (Pl. Ex 122, for identification and Def. Ex 134 for identification) were "redacted" versions of Def Ex. 9A,

providing only the information as needed for publication in the Official Gazette.[7]

Corcoran Tr. 2/20/07 pm at 21:21- 22:13, 25:15-26:6.  Counsel's statements, however, are

not evidence!  Simply stated, Iran presented no evidence in support of its counsel's theory

regarding these multiple sets of signed minutes.  Indeed, Mr. Dadyar not only had no

explanation for the discrepancies between the alternative sets of minutes; but asserted that

the Board of Directors would have to supply the explanation.  Dadyar Tr. 02/13/07 pm at

9:16-22, 26:1-6.[8]

In the wake of this confusion, the Court made clear to Iran that its counsel's

explanation for the alternate sets of minutes would not be credited in the absence of a

witness with personal knowledge who could testify concerning this so-called "redaction"

theory.  Tr. 2/21/07 pm at 32:6-15; 3/1/07 am at 19:4-13.

So while it admitted Def. Ex. 9 and Def. Ex. 9A, the Court acknowledged that the

authenticity and reliability issues raised by McKesson were substantial and that the

question of admissibility was a "close call."  Tr. 3/1/07 am at 40:9-22; 41:13-14.  Indeed,

---

[7] According to Counsel, Def. Ex. 122 was a draft of the minutes intended for publication, while Def. Ex. 134 purportedly was the final set of abbreviated minutes for publication. Corcoran Tr. 2/20/07 pm at 21:21 to 22:13.

[8] Iran also produced in court two black binders that purportedly contain original sets of Pak Dairy Board of Directors meetings during 1980 and 1981.  Tr. 3/1/07 am at 31:18-20 (returning to Iran's counsel binders that were handed up to the bench).  The binders raised additional questions that could not be answered and failed to provide any insight into why three sets of minutes exist for the same meeting, all different, only one of which purports to report on a discussion at the meeting concerning the dividends owed to McKesson.  Tr. 3/1/07 am 12:11 to 16:15.

in light of the many issues surrounding these exhibits, the Court expressly reserved its "evaluation of the weight to give to 9 and 9A until my review of my notes, the transcripts, and the proposed findings of fact and conclusions of law" to be submitted later.  Tr. 3/1/07 am at 41:6-11.

Having now reviewed the transcripts, the notes made during trial, and the parties' post-trial submissions, the Court finds that these unexplained irregularities between the three different sets of minutes (all signed but only one arguably containing information relevant to the "come to the company" defense), cast such grave doubt on the probative value of Def. Ex. 9 and Def. Ex. 9A that the Court cannot accredit any probative value to any of the three purported sets of minutes.

However, even assuming that Def. Ex. 9 and Def. Ex. 9A should be credited for representing what they purport to say, the Court would still conclude for the following reasons that they are *not* evidence of the implementation of a "come to the company" requirement by the Board of Directors at that October 26, 1981 meeting.[9]  How so?

First, as the contested portion of the minutes makes clear, the decision of the Board that day merely involved a continuation of Pak Dairy's alleged practice of "credit[ing] the dividend of foreign shareholders, like the previous years, to their account . . . ."  Def. Ex.

_____

[9] As stated previously, McKesson has raised issues regarding the English translation of DX 9 and DX 9A, particularly with regard to the meaning of the Persian word "moradje'eh" as used in the minutes, and it disputes Iran's contention that, under Iranian law, the minutes reflect the adoption of a binding requirement.  For present purposes, the Court evaluates this evidence in light of Iran's English translation and assumes, without deciding, that the contested minutes reflect a legally binding act under Iranian law by the Pak Dairy Board of Directors.

9A, ¶ 9 at 3.)  Mr. Dadyar himself testified that such a practice already was in effect at

Pak Dairy, as do the contested minutes themselves.  Dadyar Tr. 2/12/07 am, 51:1-5; Def.

Ex. 9A.  Accordingly, these minutes do not establish that the Board adopted a *new* policy

or requirement at that Board meeting for the payment of dividends.[10]

Moreover, the Court's interpretation of Def. Ex 9 and Def. Ex. 9A rests not only on

the plain language of the minutes themselves, but also on the absence of any contrary

testimony on the subject from witnesses with personal knowledge.  Mr. Dadyar and Mr.

Hejazi both worked at Pak Dairy at the time of the contested Board meeting and, as noted

above, Mr. Hejazi claims to have been present at the meeting.  Dadyar Tr. 2/12/07 am at

44:20 to 45:3; Hejazi Tr. 2/21/07 am at 46:20-25.  Since neither of these witnesses, and in

particular Mr. Hejazi, testified under oath that the Board implemented a "come to the

company" requirement at the meeting, this Court cannot accept Iran's contention that the

Board did so.

Finally, Iran contends that Pak Dairy's implementation of a "come to the company"

requirement can be shown by Def. Ex. 7 and Def. Ex. 7A, a copy and the original,

_____

[10]  Iran contends that with the phrase "until they [McKesson] come to the company to collect" the dividend, the Board instituted a "come to the company" requirement specifically for McKesson.  However, this phrase indicates only the time period during which the company would continue to credit McKesson's dividend on its books.  Therefore, the Court construes the "until" clause as a direction to credit McKesson's dividend on Pak Dairy's books while the dividends remain unpaid.  Such a reading comports fully with Mr. Dadyar's testimony regarding Pak Dairy's accounting procedure for dividends, Dadyar Tr. 2/14/07 am at 29:18 to 30:14; 37:21 to 38:6, 2/15/07 am at 3:17 to 5:5, and Def. Ex. 8b, which is a page from an accounting journal which shows the credit was posted.  None of this evidence, however, indicates that Pak Dairy's Board implemented a requirement that shareholders appear at Pak to collect their dividends.

respectively, of a memorandum dated October 31, 1981 from the Managing Director to

the Accounts Department of Pak Dairy.  The memorandum states that the Board of

Directors approved the payment of dividends at its meeting of October 26, 1981.  Def.

Ex. 7A, ¶ 1.  It further states that McKesson's dividends "will be credited to their account

as in the past so that it could be paid to them upon their coming to the company." *Id* at ¶

2.

 While the Court admitted Def. Ex. 7 and Def. Ex. 7A over McKesson's objections

as to authenticity, credibility, and reliability,  Iran's argument that Def. Ex. 7 and Def. Ex.

7A reflect a "come to the company" requirement fails on the same grounds explained

above with respect to Def. Ex. 9 and Def. Ex. 9A.  Simply stated, no "requirement" is

established by these exhibits and their text creates no *duty* that McKesson must perform.

 At most, these exhibits represent nothing more than a directive to Mr. Dadyar to

make an internal accounting entry.  Posting a debt to an internal accounting entry,

however, does not prove that the company was ready, willing and able to pay the debt at

that time.[11]  Moreover, these documents do not support Iran's "come to the company"

defense because, like Def. Ex. 9 and Def. Ex. 9A, they neither state a requirement nor

---

 [11] In support of its argument, Iran also offered the contested minutes of Pak's October 26
or 27, 1981 Board meeting, and an account ledger dated November 16, 1981.  Def. Ex.  9 and
9A; Def. Ex. 8A.  Additionally, Mr. Dadyar testified that he personally and routinely credited
dividends to the creditors' account.  Dadyar Tr. 2/14/07 am at 32:25-37:4.  Again, however, the
Court finds that the evidence of crediting McKesson's dividends to a creditor's account proves
nothing more than the fact that certain entries were made in a particular ledger book.  It does not
prove that Pak Dairy would have paid McKesson its dividends if it had "come to the company"
to collect them.

establish that a pre-existing requirement was in place.  Indeed, Mr. Dadyar testified at

length about these very exhibits, but never testified that he understood the instructions

from the Managing Director to reflect the imposition of a "come to the company"

requirement.  Mr. Dadyar also testified about discussions he had with his boss, Mr.

Azimi, concerning handwritten notes directed to him.  *Id.*, 22:8 to 23:7.  Again, Mr.

Dadyar's testimony does not mention that "a come to the company" requirement was

imposed by Pak Dairy.

Thus, based on the exhibits themselves and the testimony concerning them, the

Court finds that Def. Ex. 7 and 7A failed to show that Iran implemented a "come to the

company" requirement, whether pursuant to instructions set forth in the memorandum or

to some previous act purportedly taken by Pak Dairy.

In sum, based on its evaluation of all of the documentary and testimonial evidence

in the record and determination of the credibility and trustworthiness of that evidence, the

Court finds that Iran failed to establish by a preponderance of the evidence that Pak Dairy

chose to implement a "come to the company" requirement.

Finally, although Iran argues that the Court must consider the testimony of several

expert witnesses *prior* to deciding whether Iran chose to implement a "come to the

company" requirement, the Court, for the following reasons, disagrees and has cancelled

the second half of the bench trial.

First, the Court believes that the proffered opinions of Iran's experts will not assist

17

the Court in deciding the issues remanded to it by the Court of Appeals because its premise of a "default rule" for those who do not go to the company to receive their dividends is at odds with the decision of the Claims Tribunal, which (as noted above) found that a "clear breach" of Pak Dairy's "duty" occurred when Pak Dairy withheld declared dividends from McKesson, notwithstanding the "come to the company" defense asserted by Pak Dairy.   Pl. Ex. 98 at 16.

Second, any evidence offered to support such a "default" rule would conflict with the earlier conclusion by our Court of Appeals to the effect "that no general principle of Iranian corporate law excuses Pak Dairy's withholding of McKesson's dividends due to its failure to come to the company." 271 F.3d at 1109.

Third, the proffered evidence from Iran's "custom and practice" witnesses would be cumulative of legal opinions concerning the "default" rule and would not establish the existence of a legal requirement for Pak Dairy because, as the Court understands Iran's proffer, the "custom and practice" witnesses have no personal knowledge regarding any requirements at Pak Dairy.

Finally, no opinion testimony is necessary on the meaning of "moradje'eh" or on the question of whether the minutes of the Pak Dairy Board of Directors meetings are somehow legally binding.[12]  First, the Court has reached its conclusions assuming,

_____

[12]   Iran contends that the term "moradje'eh" as used in Def, Ex. 9, 9A, 7 and 7A is widely understood by Farsi speakers to mean that a person must physically appear at the place indicated to transact business.  Iran has further argued that the minutes of the Pak Dairy board constitutes a legally binding resolution of the Board.  McKesson disputes both issues.

18

*arguendo,* that the Iranian translation of "moradje'eh" is accurate.  Second, whether or not

the Board meeting minutes are legally binding is irrelevant given the Court's

interpretation of those minutes and its grave concerns as to their authenticity.

Accordingly, opinion testimony on these issues is unnecessary.

## B.  McKESSON'S "FUTILITY" CLAIM

As noted above, our Court of Appeals additionally remanded this case for trial on

McKesson's futility claim in the event that Iran established that Pak Dairy had

implemented a "come to the company" requirement.  Although the Court has concluded

that Iran failed to meet that burden, it is prudent, nonetheless, to state its findings of fact

on McKesson's futility claim now that it has heard that evidence.  Accordingly, after

reviewing the evidence offered at trial, the Court finds that even assuming that Pak had

imposed a "come to the company" requirement, compliance with such a requirement

would have been futile.  Indeed, for the following reasons, the evidence offered at trial

clearly indicates that Pak had no intention of paying McKesson its dividends at any time

after 1979.

First, Pak Dairy repeatedly denied, without explanation, McKesson's requests for

payment.  As noted above, on May 21, 1980, McKesson wrote to Pak requesting that its

dividends be immediately deposited in a bank account in McKesson's name.  Pl. Ex. 39;

Tr. 2/26/07 pm at 49:19-51:15.  On May 27, 1980, Pak Dairy responded via telex,

informing McKesson that: "due to [the] decision and instruction of the Board of

19

Directors, Pak Dairy can not pay any sums of money *for any reason* to foreign

shareholders." Def. Ex. 52 (emphasis added). That decision was formally announced at a

meeting of Pak Dairy's Board of Directors on June 2, 1980. Def. Ex. 33 at 3 ("on the

basis of the government's decision, no payment will be made to the foreigners").

According to both Mr. Moshiri and Mr. Vahdati, government representatives on Pak's

Board of Directors opposed payments of dividends to foreigners. Moshiri Tr. 2/28/07 pm

at 10:1-2 [Moshiri Dep. 34:2-6 ]; Vahdati Tr. 2/27/07 pm at 36:14-15 [Vahdati Dep.

27:9-16]. And, no evidence was ever offered at trial that demonstrated a change in this

policy by the Pak Board after it fell under the control of government representatives.

Second, when a demand was made to the Board *in person*, it was also rejected

without explanation. At trial, Mr. Vahdati, McKesson's representative on the Board of

Directors, credibly testified to making a formal written demand to the Pak Dairy Board

for payment of McKesson's dividends. The request was discussed at the Board's April

29, 1981 meeting (which Mr. Vahdati attended), and it was decided by the Board that

payment would not be made. No reason reflecting a "come to the company" requirement

was given. Instead, the Board simply referred the claim to a committee at Iran's central

bank responsible for investigating international claims.[13]

Finally, on October 23, 1981, after numerous attempts to negotiate a settlement

---

[13] Moreover, Mr. Vahdati was not only threatened by another member of the Board, but on May 12, 1981, was arrested by agents of the Ministry of Justice, held in solitary confinement and interrogated about his connection to the McKesson Corporation. Vahdati Tr. 2/28/07 am at 9:23-24 [Vahdati Dep. 46:9-47:7, 47:13-51:22].

had failed, McKesson made a final written demand for payment to the Pak Board. Def.

Ex. 32. Iran responded on November 11, 1981, ambiguously expressing its "readiness for

taking proper measures" with regard to "the payment of [McKesson's] dividend." Def.

Ex. 34.[14]   Although Iran argues that this message indicated Iran's willingness to pay

McKesson its dividends, and our Circuit Court held that the telex could be construed as

an offer to pay the dividend, 271 F.3d at 1109-1110, Mr. Hejazi, who was a member of

Pak's negotiating team,[15] testified that the telex was nothing more than an attempt to

restart settlement negotiations. Hejazi Tr. 2/23/07 a.m. 3:15-4:7. No evidence was

offered contradicting Mr. Hejazi's testimony.

In this Court's judgment, the only reasonable conclusion that can be drawn about

Iran's intentions from these three unsuccessful attempts by McKesson is that nothing

McKesson would, or could, do would result in the payment of their dividends. To put it

in 1960's vernacular: "you don't need a weatherman to know which way the wind

_____

[14] Pak's telex read in full:

> As regards the payment of your dividend, this company has repeatedly announced its readiness for taking proper measures but you have not taken appropriate action in this regard. If you really mean to settle this issue, you can introduce your plenipotentiary representative to us so that necessary steps may be taken according to the current regulations.

Def. Ex. 34.

[15] Mr. Hejazi acknowledged on cross-examination that he was an active member of the negotiating team, was involved with the other members in the team's preparations, and was kept informed about the company's plans and objectives for the negotiation. Hejazi Tr. 2/22/07 am at 38:16 to 39:4.

blows."[16]

However, if that were somehow not enough, there was additional evidence offered

at trial which demonstrated that Pak Dairy actually planned to use McKesson's dividends

as *leverage* in its negotiations of McKesson's claim, notwithstanding informing Pak

Dairy on September 28, 1981 that it was "ready to settle the accounts and disputes

through direct negotiations." Def. Ex. 28. Indeed, according to Mr. Hejazi, who was

privy to Pak's negotiations plans, Pak intended to use the dividend payments as *leverage*

in order to force McKesson to give up its expropriation claim.[17] Hejazi Tr. 2/23/07 a.m.

at 12:9-17. Thus, rather than standing ready to pay McKesson its dividends, Mr. Hejazi

further testified, Pak intended to force McKesson to litigate its claim in the Hague if

negotiations failed.[18] *Id.*

Finally, it is clear from the anti-American sentiment prevalent in Iran at the time

and the abuse suffered by McKesson representatives in Iran, that compliance with the

supposed "come to the company" requirement would have been futile during the relevant

---

[16] B. Dylan, *Subterranean Homesick Blues*, *on* BRINGING IT ALL BACK HOME (Columbia Records 1965).

[17] In his deposition, Mr. Hejazi testified:
> Q. Now one of the objects of your negotiating team was to hold the dividend hostage to get [McKesson] to give up [its] expropriation claim, correct?
> A.    Yes.

Hejazi Tr. 2/23/07 am at 12:9-12.

[18]    Dr. Sanaie, a representative of the Iranian central bank who offered assistance to Pak Dairy with the anticipated negotiations, testified that it was probable that a negotiated settlement would mean that McKesson would not be paid fully for past-due dividends. (Sanaie Tr. 2/20/07 pm at 53:17-24.)

period.  Indeed, according to Mr. Hejazi, anti-American demonstrations took place in the

streets of Tehran from the time of the Revolution through 1983, Hejazi Tr. 2/22/07 am at

30:3-6, and as late as January 1981, the United States government was warning

Americans against traveling to Iran because they could be arrested or taken hostage.  Pl.

Ex. 52.  Mr. Patterson likewise testified that McKesson representatives would not travel

to Iran based on the perception that conditions there were "very threatening to

Americans."  Patterson Tr. 2/26/07 pm at 82:13-16.

Iranians working for McKesson in Iran, likewise, faced considerable personal

danger during this time.  As noted earlier, Mr. Vahdati made a formal demand for

payment of McKesson's dividends in March 1981 and appeared at the Board of Directors

meeting on April 29, 1981.  Soon after, Mr. Vahdati was threatened by a fellow member

of the Pak Board who represented one of the Iranian government shareholders.  Vahdati

Tr. 2/28/07 am at 9:23-24 [Vahdati Dep. Tr. 46:9-47.7].  More ominously, on May 12,

1981, Mr. Vahdati was arrested by two members of the Iranian Revolutionary Guards,

held *in communicado,* for more than 24 hours and questioned about his representation of

McKesson on Pak Dairy's Board.  Vahdati Tr. 2/28/07 a.m. at 9:23-24 [Vahdati Dep.

46:9-47:7, 47:13-51:22].  While Mr. Vahdati was under arrest, his home and office were

searched and vandalized.  *Id* at Vahdati Dep. Tr. 54:7-29, 62:15-20.  When he attended

the next Board of Directors meeting, Mr. Vahdati was again confronted and threatened by

a government representative on the Board.  Vahdati Tr. 2/28/07 am 23:23-24 [Vahdati

Dep. 69:8-70:14].  He resigned shortly thereafter.  *Id* at Vahdati Dep. Tr. 66:5-11.

Given the evidence on the record, the Court cannot possibly conclude that Pak was

prepared and willing to pay McKesson its dividends if it sent a representative to collect

them at any time during the relevant period.  Accordingly, the Court finds that compliance

with a "come to the company" requirement, even if it had existed, would have been

futile.[19]

## C.  WITNESS CREDIBILITY

Finally, the Court would be remiss if it did not make some observations regarding

the credibility of plaintiff's and defendant's witnesses at trial.

First, with respect to the plaintiff's witnesses who were long-time employees of

Pak Dairy (i.e. Mr. Dadyar and Mr. Hejazi), the Court found their testimony to be

frequently in conflict with their deposition testimony and often times internally

inconsistent.  As a result, their testimony was, on the whole, lacking in credibility.

For example, Mr. Dadyar's testimony was inconsistent with regard to his position

and responsibilities at Pak Dairy.  While one might expect a less than perfect recollection

of the dates he held his various positions over 30 years in the accounting department[20], it

_____

[19]  Although both parties have designated experts to testify as to the futility issue, none of these proposed experts has first-hand knowledge concerning Pak Dairy.  As a result, that testimony will not assist the Court in this fact-based inquiry.  Accordingly, the Court finds that the futility issue can be resolved on the record before the Court, and that additional trial testimony by experts is not needed on this issue.

[20]  Although Mr. Dadyar testified on direct examination that he had first-hand experience with the procedure for paying shareholders dividends in 1981 after becoming Pak's Chief

certainly was surprising, for example, that he suddenly remembered during the trial that

he had worked on shareholder dividend matters at Pak Dairy when he had failed to recall

that critical detail during his earlier deposition.[21]  In addition, his attempt on direct

examination to appear knowledgeable about the company's Board of Directors minutes

seemed particularly incredible when confronted with his deposition testimony that his

duties did not include reviewing the minutes of Board meetings.  Dadyar Tr. 2/13/07 am

at 8:6-14; 45:18-46:13.

    More importantly, on the issue of the "come to the company" defense, Mr.

Dadyar's testimony at trial that McKesson's failure to comply with this so called

requirement was the reason for the non-payment, was in stark contrast to his deposition

testimony where he listed several other reasons to account for the non-payment, none of

which included a failure by McKesson to "come to the company."  Dadyar Tr. 2/15/07 am

at 9:7-10:9.  This reversal, at such a late date in the proceedings, and without any

acceptable explanation, is so troubling that it devastated Mr. Dadyar's credibility in the

eyes of the Court.

    Similarly, Mr. Hejazi's testimony throughout the trial was riddled with

_____

Accountant, he admitted on cross-examination that it was "probable" that he did not become
Chief Accountant until 1983 or 1984.  Dadyar Tr. 2/12/07 pm at 8:4-10; 2/15/07 am at 34:14-
35:2.

    [21]  Despite initially claiming that he had experience with shareholder matters as a Senior
Accountant during the relevant period, Mr. Dadyar later acknowledged that he had no experience
in dealing with the "accounts and accountings relating to dividends and shareholder matters"
while in that position.  Dadyar Tr. 2/15/07 am at 35:3-14; 35:22-36:6.

inconsistencies that undermined his credibility.  In particular, Mr. Hejazi's credibility was

seriously harmed when his representation on direct examination that he had been a voting

member of the Pak Dairy board turned out on cross-examination to be false, inasmuch as

he had to admit that he was only a designated observer on behalf of the Worker's Council,

without any right to vote.  Hejazi Tr. 2/21/07 am at 49:4-5; Hejazi Tr. 2/22/07 am at 22:3-

5, 24:2-4, 26:3-10.  While this mischaracterization, alone, might not have been enough to

sink his credibility, his reversal of his earlier testimony on the stand that he had *not*

attended a particular Board meeting, in order to allay the Court's concern that his

testimony as to what had happened at that particular meeting was merely hearsay

testimony, was particularly unsettling to the Court and greatly undercut his credibility.

Hejazi Tr. 2/21/07 pm at 25:25-26:2, 26:7-17.

In short, the many inconsistencies and contradictions by these two former

employees, when combined with their unsettling demeanor on the witness stand during

direct and cross-examination, so undermined the Court's confidence in them as to render

their testimony of no real value.

By contrast, the witnesses offered by the plaintiff, though few in number, were

credible to the Court.  For example, McKesson's in-house counsel, Mr. Patterson, who

was responsible for handling legal matters relating to Pak Dairy, testified credibly

regarding the practice of payment by Pak Dairy prior to the Revolution, the demands

made to Pak Dairy after the Revolution and the arbitration of McKesson's claims before

the Hague Tribunal.  His testimony was corroborated by relevant documents and at no

time during cross-examination was he impeached.  As a result, the Court found him at all

times to be a very credible witness.

Similarly, the two witnesses offered via videotape deposition, Mr. Moshiri and Mr.

Vahdati, were clear, consistent and credible on the matters about which they testified.

Mr. Vahdati's account of his demand to the Board of Directors and his subsequent arrest,

confinement and interrogation was credible and uncontradicted.  The Court believes that

this treatment by Iranian officials was a direct consequence of his demand for the

dividend payments.  Similarly, Mr. Moshiri, who served as outside counsel to McKesson

during this period, testified as to the business practices of McKesson and Pak Dairy in the

period leading up to and immediately after the Revolution.  His testimony was also

consistent, credible and uncontradicted.

For all of these reasons, the Court accords great weight to the testimony offered by

the plaintiff's witnesses while holding little confidence in the credibility of the testimony

offered by defendant's witnesses.

### III. TREATY OF AMITY

In 1997, Judge Flannery held that the Treaty of Amity between Iran and the United

States affords McKesson a cause of action to recover damages for Iran's expropriation of

its dividends and interest in Pak Dairy. *McKesson,* 1997 WL 361177 at 14-15.  He found

the Treaty to be self executing and concluded that Iran had indeed failed to compensate

27

McKesson and was, therefore, "liable for its violation in this Court." *Id* at 13-15.

In 2001, our Court of Appeals affirmed Judge Flannery's decision, holding that the Treaty provides McKesson a cause of action. *McKesson,* 271 F.3d 1101. In particular, the Circuit Court concluded that the Treaty "explicitly creates property rights for foreign nationals" and does not require "that the protection can only be enforced in the territory of the other contracting party." *McKesson,* 271 F.3d at 1108. Indeed, the Court of Appeals concluded that denying McKesson a U.S. forum would "conflict with the Treaty's purpose—protecting property of U.S. nationals—particularly because Iran's post-revolutionary courts cannot provide adequate remedies for U.S. [claimants]." *Id.*

Two years later, however, the Court of Appeals amended the Treaty portion of its earlier decision and remanded it to this Court for reexamination in light of a brief that had been filed in the meantime by the Solicitor General interpreting the Treaty of Amity as not creating a cause of action. *McKesson HBOC v. Islamic Republic of Iran,* 320 F.3d 280 (D.C. Cir. 2003).

This Court heard oral argument from the parties and the Department of Justice on this issue on March 2nd and 20th, 2007. After reviewing the extensive briefs and the oral arguments, this Court concludes that Judge Flannery's earlier decision was correct and sees no reason to disturb that holding. How so?

It is important to note at the outset that while the views of the United States on the meaning of treaties are entitled to great weight, they are not conclusive. *Sumitomo Shoji*

*America, Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982).  Indeed, this is particularly true, for a number of reasons, in a case like this.

First, the issue of whether a particular Treaty gives rise to a cause of action is one particularly reserved for the Federal Courts.  *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41 n.27 (1977) (Executive Branch's views are "of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants"); *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1095 (1st Cir. 1989) (courts seldom defer to an agency when the issue involved is "'*purely a legal question . . .,*' e.g., whether [a statute] provides a private right of action."); cf. *Alexander v. Sandoval*, 532 U.S. 275, 287-91 (2001) (rejecting view of United States as intervenor that Title VI of the Civil Rights Act of 1964 creates a private right of action); *Tsosie v. United States*, 825 F.2d 393, 401 (Fed. Cir. 1987) (rejecting United States' position that individual could not bring suit against United States for damages under "bad man" clause of Navajo Treaty absent implementing legislation).  Even the United States does not dispute this point.

Second, the United States' change in interpretation of Article IV(2) of the Treaty—over twenty years into this litigation—is at odds with the clear language of the Treaty.  Simply stated, one cannot reasonably interpret this Treaty language without according  both a *right* to protection against government taking without compensation and

29

a *remedy* in the form of a prompt payment of just compensation. The United States and

Iran somehow conclude, however, that according this right and remedy is *not* tantamount

to also granting the aggrieved party a cause of action in our Federal Courts to enforce

their right to a prompt and just compensation. That idea is, at best, incredible!

A treaty provision that establishes an individual right and a remedy for its violation

by *necessity* expressly confers a cause of action in our courts for those whom this

provision was intended to protect. See, e.g., *In re Mexico City Aircrash* of October 31,

1979, 708 F.2d 400, 412 (9th Cir. 1983) (noting that "the normal meaning" of Article 17

of the Warsaw Convention, which provides that carriers "*shall be liable* for damage

sustained in the event of the death or wounding of a passenger," is that "a passenger

injured during international air transport may maintain an action to impose liability on the

carrier")(emphasis in original); *Curtin v. United Air Lines, Inc.*, 275 F.3d 88, 90 (D.C.

Cir. 2001) (holding that Article 18 of the Warsaw Convention creates a cause of action to

recover damages); *cf. Hebah v. United States*, 428 F.2d 1334, 1337-38 (Ct. Cl. 1970)

(holding that a treaty requiring the United States to "reimburse the injured person for the

loss sustained" as a result of wrongs committed against native Americans by "bad men

among the whites" created both a right and an obligation, thus allowing individual native

Americans to sue the United States for damages). To hold otherwise would be to render

meaningless the plain language of the Treaty, particularly when that Treaty is with a

foreign country that affords our citizens (and companies) *no* realistic legal process

30

through which to vindicate this right.  Judicial deference to the Executive Branch should

not extend that far!

    To the contrary, Federal Courts have not hesitated in the past to reject the

Executive Branch's interpretation of a Treaty where its interpretation is at odds with the

plain meaning of a treaty's language.  See, e.g., *Chan v. Korean Air Lines, Ltd.,* 490 U.S.

122, 133-34 (1989) (rejecting interpretation of Warsaw Convention provision as

excluding airline from limitation on liability based on airline's breach of notice

provision); *Perkins v. Elg*, 307 U.S. 325, 337 (1939) (rejecting argument that

naturalization treaty abrogated minor's right to elect citizenship on attaining majority);

*Valentine v. United States ex rel Neidecker*, 299 U.S. 5, 12-13 (1936) (rejecting

interpretation of extradition treaty as empowering the Executive Branch to surrender

United States citizens); *Rainbow Navigation, Inc. v. Dep't of Navy*, 686 F. Supp. 354,

356-59 (D.D.C. 1988) (rejecting argument that treaty with Iceland was not self-

executing).  Moreover, to do so in this case is not only consistent with Section 907 of the

Restatement (Third) of the Foreign Relations Law of the United States,[22] but *not*

inconsistent with any principle of international law cited by either the United States or

Iran.  Simply stated, absent a showing that the parties intended the Treaty to prevent an

------

    [22]  According to the Restatement: "A private person having rights against a foreign state
under an international agreement of the United States may assert those rights against that state in
courts of the United States of appropriate jurisdiction by way of claim or defense, subject to
limitations under international law."  Restatement (Third) of the Foreign Relations Law of the
United States, Section 907(2).

investor from suing under Article IV(2) in the Courts of its own country, this Court will

not contort this plain language to reach that otherwise inexplicable conclusion.

Finally, and most tellingly, the United States' concern that interpreting the Treaty

this way will open a veritable floodgate of "unwanted and unbargained-for suits in

foreign countries against the United States," U.S. Brief at 21-23, is simply preposterous!

The Executive Branch has cited no instances in which any foreign Court has relied upon

either Judge Flannery's 1997 ruling, or our Circuit Court's affirmation in 2001, as a basis

for enforcing a treaty against the United States.  Undoubtedly the doctrine of foreign

sovereign immunity,[23] and the unique facts in this case, have rendered illusory any threat

of a significant increase in Treaty based foreign lawsuits.  And there is no reason today, to

foresee anything different in the future.

Thus, for all of the above reasons, this Court affirms Judge Flannery's

interpretation of the Treaty of Amity and holds that McKesson has a cause of action

against Iran in this Court for the expropriation by Iran of its dividends and equity interest

in Pak Dairy.

## IV.  CONCLUSION

Upon review of the evidence offered at trial and the entire record herein, the Court

---

[23] As a general rule of customary international law, states are immune from the jurisdiction of foreign courts, subject to specific exceptions.  *See* Oppenheim's International Law (9th ed.), § 109 Equality of States and Immunity from Jurisdiction, at 341-363.

finds that the Pak Dairy Board did not implement a requirement that McKesson appear, in person, at Pak to collect the company's dividends and that even if it had, compliance with that requirement would have been futile.  The Court further concludes that, despite the Government's change of position, the Treaty of Amity provides McKesson a cause of action in this Court for the uncompensated expropriation of its dividends and interest in Pak Dairy.  Accordingly, the Court affirms Judge Flannery's decision to hold Iran liable and reaffirms his award of damages.


RICHARD J. LEON
United States District Judge