# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MCKESSON CORP.** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 82-220 (RJL)** |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION
### November 19, 2010

Plaintiff, McKesson Corporation ("McKesson"), a U.S. company, alleges that defendant, Islamic Republic of Iran ("Iran"), expropriated McKesson's interest in an Iranian dairy and illegally withheld dividends. This case has spanned twenty-eight years and reached our Court of Appeals five times. Most recently, following remand by the Court of Appeals, I held that McKesson does have a cause of action under Iranian law, that customary international law continues to provide McKesson with a cause of action, and that the act of state doctrine does not apply in this case. *See McKesson Corp. v. Islamic Republic of Iran*, No. 82-220, 2009 WL 4250767 (D.D.C. Nov. 23, 2009). Following that ruling, the parties submitted additional briefing on the merits of the Iranian law causes of action. Upon review of the parties' submissions, as well as the arguments of counsel at the hearing held on this matter and the extensive record in this case, the Court now enters judgment for McKesson on its Iranian law causes of action and awards $43,980,205.58 in damages and prejudgment interest.

## BACKGROUND

As the facts of this case have been described in great detail in a plethora of opinions by our Circuit, Judge Flannery, and this Court, the following short summary shall suffice.[1] In 1960, McKesson and a group of Iranian investors joined together to create Pak Dairy ("Pak").  During the Iranian Revolution in 1979, McKesson personnel at Pak fled the country, and the Iranian government took control of Pak's Board of Directors. *See McKesson 2007*, 520 F. Supp. 2d at 40.  In 1982, McKesson sued Iran in this Court alleging, *inter alia*, that Iran had illegally withheld dividends issued by Pak and that Iran had, as a result of this and other interferences with McKesson's property rights, expropriated its thirty-one percent interest. *See id.*

In 1997, after years of litigation and two appeals to our Circuit, Judge Flannery, who was previously assigned this case, found Iran liable under customary international law and the 1955 Treaty of Amity, Economic Relations, and Consular Rights ("Treaty of Amity" or "the Treaty") between the United States and Iran for expropriating McKesson's equity interest and for withholding the dividends. *McKesson 1997*, No. 82-

---

[1] For additional background, see our Circuit's previous decisions, *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) ("*McKesson I*"); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346 (D.C. Cir. 1995) ("*McKesson II*"); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001) ("*McKesson III*"); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 320 F.3d 280 (D.C. Cir. 2003) ("*McKesson IV*"); and *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485 (D.C. Cir. 2008) ("*McKesson V*"), as well as the previous decisions issued by Judge Flannery and this Court, including *McKesson Corp. v. Islamic Republic of Iran*, No. 82-220, 1997 WL 361177 (D.D.C. June 23, 1997) ("*McKesson 1997*"); *McKesson Corp. v. Islamic Republic of Iran*, 116 F. Supp. 2d 13 (D.D.C. 2000) ("*McKesson 2000*"); *McKesson Corp. v. Islamic Republic of Iran*, 520 F. Supp. 2d 38 (D.D.C. 2007) ("*McKesson 2007*"); and *McKesson Corp. v. Islamic Republic of Iran*, No. 82-220, 2009 WL 4250767 (D.D.C. Nov. 23, 2009) ("*McKesson 2009*").

220, 1997 WL 361177 at *12-16.  Following a bench trial from January 18 through

February 17, 2000, Judge Flannery held that McKesson was entitled to $20,071,159.14 in

total damages, which includes the value of the expropriated property and prejudgment

interest. *McKesson 2000*, 116 F. Supp. 2d at 35-36, 43 (citing Treaty of Amity).

In 2001, our Circuit affirmed Judge Flannery's judgment in part, but remanded the

case for another trial on two particular factual issues. *McKesson III*, 271 F.3d at 1110.  In

2003, the Circuit further ordered this Court, which in the meantime had been assigned to

this case, to also reexamine Judge Flannery's decision that the Treaty of Amity provides

McKesson with a U.S. cause of action in this Court. *McKesson IV*, 320 F.3d at 281.

After extensive discovery and motions practice with regard to the remanded issues, this

Court conducted a three-week bench trial in 2007 on the two factual issues remanded.

Once again, McKesson prevailed at that trial, and this Court issued a lengthy Opinion

reinstating the 2000 judgment against Iran. *McKesson 2007*, 520 F. Supp. 2d at 40.  On

appeal, our Circuit held, however, that contrary to its previous decisions, the Treaty of

Amity does not provide McKesson with a cause of action in our courts. *McKesson V*,

539 F.3d at 491.  As such, the Court of Appeals remanded the case to this Court on

August 26, 2008, for consideration of three legal issues to determine whether there was a

sufficient legal basis for this suit to go forward. *Id.*

On November 20, 2009, following yet another round of briefing by the parties, this

Court held that McKesson does have a cause of action under Iranian law, that customary

international law continues to provide McKesson with a cause of action, and that the act

of state doctrine does not apply in this case. *McKesson 2009*, No. 82-220, 2009 WL 4250767, at *1. Undaunted, Iran filed a motion for certification of an immediate interlocutory appeal, which I denied on January 26, 2010. The parties then filed briefs on the merits of the Iranian law causes of action—the Treaty of Amity, the Civil Responsibility Act, the Civil Code, and the Commercial Code—and I held oral argument on August 26, 2010. For the following reasons, I find that McKesson is entitled to judgment on each of the four causes of action it asserts under Iranian law and reinstates the 2000 judgment awarding damages and prejudgment interest through May 26, 2000, the date of Judge Flannery's decision. In addition, the Court awards McKesson compound interest from May 27, 2000, to the date of this Opinion.

## ANALYSIS

To say the least, the parties are in stark disagreement as to the appropriate disposition at this stage of the case. Viewed most charitably, Iran's current position is that certain issues previously addressed by this Court must now be litigated under Iranian law for the first time. McKesson counters that Iran is merely attempting to obtain reconsideration of numerous findings of fact and law that have long since been decided and are the law of the case. I agree with McKesson. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("The Supreme Court has instructed the lower courts to be loathe to reconsider issues already decided in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." (internal quotation marks omitted)); *see also McKesson II*, 52 F.3d at 350

4

("[L]aw-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.").

Iran's attempt to relitigate issues, such as its "come to the company" defense that diverted this litigation for a number of years, is simply incredible. More specifically, the Court has considered and rejected Iran's argument, made over a decade ago, that Iranian law imposes a general "come to the company" requirement on shareholders in Iranian companies, and that holding was expressly *affirmed* by the Court of Appeals in 2001. *See McKesson III*, 271 F.3d at 1109 ("[W]e agree with the district court that no general principle of Iranian corporate law excuses Pak Dairy's withholding of McKesson's dividends due to its failure to come to the company."). Moreover, during the 2007 trial before this Court, Iran failed to prove its factual defense that Pak Dairy had in fact adopted such a requirement, and this Court also held that even if there had been a "come to the company" requirement, it would have been *futile* for McKesson to seek its payment in that manner. *See McKesson 2007*, 520 F. Supp. 2d at 50-51. Similarly, Iran's attempt to resuscitate the separate juridical entity question is remarkable, given that it has already been found, and affirmed, that Iran's role in causing Pak Dairy to cut off dividend payments to McKesson was "direct and manifest." *McKesson II*, 52 F.3d at 351-52; *see McKesson 1997*, No. 82-220, 1997 WL 361177, at *7 (citing 1993 Opinion [Dkt. #207]).

Finally, Iran's argument that it cannot be held liable because this Court held that the cut-off of dividends to McKesson was based on a governmental currency control decision to guard against capital flight mistakenly relies upon a single sentence in

*McKesson 2007*, despite the fact that the currency controls defense had been rejected by Judge Flannery a decade earlier, *see McKesson 1997*, No. 82-220, 1997 WL 361177, at *10 n.17, and thus was not even before this Court in 2007. But to make the record *indisputably* clear: this Court did *not* hold in 2007 that the non-payment of dividends to McKesson was the result of sovereign conduct by Iran to prevent capital flight. Rather, I was merely discussing the dearth of evidence presented by Iran that Pak was refusing to pay McKesson because it did not abide with an alleged "come to the company" requirement. *See McKesson 2007*, 520 F. Supp. 2d at 42-43. Indeed, it is hard to imagine how Iran could legitimately believe the currency controls defense is still viable at this stage of the litigation, given my ruling in 2009 that Iran's actions were "commercial in nature" and that the act of state doctrine therefore does not apply. *See McKesson 2009*, No. 82-220, 2009 WL 4250767, at *5. Thus, despite what appear to be Iran's latest efforts to protract this litigation even further, I will now proceed to final judgment on the merits of McKesson's Iranian law claims.

## I.    The Treaty of Amity

The Treaty of Amity provides:

> Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

6

Treaty of Amity, art. IV, para. 2.  "Under Iranian law, treaties have the force of law."

Legal Op. of Mahmoud Katirai [Dkt. #898-1] ("Katirai Op.") at 18.  To that end, Iran

does not dispute that McKesson has a cause of action under the Treaty of Amity as a

matter of Iranian law.[2]  *See* Iran's Mem. Regarding Proposed Iranian Law Causes of

Action [Dkt. #927] ("Iran's Mem.") at 14-16; Legal Op. of Dr. M.E. Sanaei [Dkt. #927-

2] ("Sanaei Op.") at 6; *see also McKesson III*, 271 F.3d at 1108 ("Iran does not dispute

that the Treaty of Amity creates enforceable rights.").  Rather, Iran asserts that the Treaty,

by its terms, requires McKesson's expropriation claim to be litigated in Iran as a

condition of the right to recover damages.  *See* Iran's Mem. at 16.  This Court and the

Court of Appeals, however, have both rejected this argument, and Iran curiously has

proffered no reason to reconsider those rulings.  *See McKesson III*, 271 F.3d at 1108

("[A]lthough this language suggests that one party will receive protections within the

territory of the other party, it doesn't say that those protections can only be enforced in

the territory of the other party."); *McKesson 2009*, No. 82-220, 2009 WL 4250767, at *2

("[I]t is difficult, if not impossible, to comprehend how a provision stating that

companies in the United States and Iran *must* have access to the courts of the other

country 'both in defense and pursuit of their rights' requires McKesson to file its suit in

Iran, much less how it requires it 'unambiguous[ly].'" (emphasis in original)).

---

[2] Although the Court of Appeals held in *McKesson V* that, contrary to its previous rulings,
McKesson does not have a Treaty cause of action in this Court under U.S. law, the Court of
Appeals did not consider whether McKesson had a Treaty cause of action under Iranian law. *See*
*McKesson V*, 539 F.3d at 488-89.

Iran further asserts that under Iranian law, the Treaty cause of action for expropriation is exclusive and supersedes all other possible Iranian law causes of action. *See* Iran's Mem. at 14-15.  Again, Iran is attempting to resuscitate an argument that has already been rejected by this Court. *See McKesson 2009*, No. 82-220, 2009 WL 4250767, at *2-3.  In fact, Iran acknowledges as much, stating that "Iran disagrees with this ruling" and pointing to a new expert opinion to "buttress" its argument.  Iran's Mem. at 14.  The expert opinion, of course, does nothing to change the fact that this issue is closed.  Simply put, Iran is not entitled to relitigate the law of the case just because it has found another expert to support its position.  Regardless, even if the Treaty were, as Iran's expert asserts, the "most appropriate" source of relief under Iranian law, the Court is convinced by McKesson's expert that there is "no provision under Iranian law that would strip a group of people of their general rights under various statutory provisions simply because they receive specific protection under a treaty."  2d Supp. Legal Op. of Mahmoud Katirai [Dkt. #929-1] ("Katirai 2d Supp. Op.") at 3; *see also McKesson 2009*, No. 82-220, 2009 WL 4250767, at *2 (noting that Iran has not offered support for its preemption argument).

Aside from rearguing that McKesson's Treaty claim must be brought in Iran and is the exclusive remedy, Iran has offered no defense to this cause of action.  This comes as no surprise, however, as the prior findings of the Court establish that McKesson's dividends and investment were taken without compensation and that Iran caused the cut-off of dividends and repudiation of McKesson's shareholder rights, in violation of the

Treaty. *See McKesson 1997*, No. 82-220, 1997 WL 361177, at \*14 ("Because the record is clear that Iran has indeed failed to compensate McKesson, Iran has violated the Treaty of Amity, and is liable for its violation in this Court."); *id.* at \*12 ("[T]here is no question in the Court's mind that interference with McKesson's shareholder rights ripened into expropriation [by April 1982]."); *see also McKesson 2007*, 520 F. Supp. 2d at 53-55 (affirming Judge Flannery's interpretation of the Treaty of Amity). In short, Iran is liable under the Treaty of Amity for the uncompensated expropriation of McKesson's dividends and interest in Pak.

Accordingly, with all elements of McKesson's Treaty cause of action already established, the Court reaffirms Judge Flannery's award of damages under the Treaty and hereby reinstates his award.[3] *See McKesson 2000*, 116 F. Supp. 2d at 35 (quoting Treaty of Amity, art. IV, para. 2). That award of $20,071,159.14 was the equivalent to the full value of the property expropriated plus simple interest, through May 26, 2000.[4] *Id.* at 43. The assessment of interest from May 27, 2000, to the present day is discussed in Part V, *infra.*

---

[3] This result is consistent with customary international law, which continues to provide McKesson with a cause of action. *See McKesson 2009*, No. 82-220, 2009 WL 4250767, at \*3-4; *see also McKesson 2000*, 116 F. Supp. 2d at 35 ("Customary international law similarly provides that compensation for expropriated property of a foreign national must be 'just.'").

[4] Specifically, Judge Flannery awarded $383,732.78 for the 1981 dividend plus $649,370.48 in interest; $341,983.96 for the 1982 dividend plus $538,245.34 in interest; and $6,893,488.55 for the expropriated equity plus $11,264,338.03 in interest, for a total compensatory award of $20,071,159.14. *McKesson 2000*, 116 F. Supp. 2d at 43.

## II.   Civil Responsibility Act[5]

McKesson alleges that Iran has violated Article 1 of the Civil Responsibility Act

of Iran, which states:

> Any person who without any legal authority intentionally or as the result of
> carelessness inflicts any harm on the life, health, property, freedom,
> dignity, commercial reputation or any other right created for people, that
> entails financial or intangible damage, shall be responsible for the damages
> resulted from his/her act.

Katirai Op. at 6.  To establish a claim under the Civil Responsibility Act, a party must

prove three elements:  (1) damage, (2) fault, and (3) causation.  *Id.* at 7.  Based on prior

findings of fact and conclusions of law in this case, it is clear that these elements have

been readily established.

First, financial damage, such as loss of property or loss of profits, is recognized as

damage under the Civil Responsibility Act.  *Id.*  In *McKesson 1997*, Judge Flannery held

that McKesson had suffered compensable damages consisting of unpaid dividends that

Pak wrongfully withheld in 1981 and 1982 and the loss of its equity interest in Pak as of

April 1982.  *McKesson 1997*, No. 82-220, 1997 WL 361177, at *12.  As described above,

the Court entered judgment for McKesson based on those damages and also held that

McKesson was damaged by the nearly twenty-year delay in compensation, awarding

simple interest.  *McKesson 2000*, 116 F. Supp. 2d at 41.

---

[5] Although McKesson is entitled to receive full compensation in the form of damages and
prejudgment interest under the Treaty, the Court will address the three Iranian statutory causes of
action in an effort to prevent yet another lengthy remand, should our Circuit Court reverse this
Court on the Treaty claim.

Second, fault under the Civil Responsibility Act includes both intentional conduct and negligence. Katirai Op. at 7. Again, prior rulings of the Court have established fault in this case on the part of Iran, as "Pak Dairy's board and its government shareholders forced the dairy to disregard its commercial mission and its duties to McKesson as a shareholder." *McKesson II*, 52 F.3d at 351; *see also McKesson 1997*, No. 82-220, 1997 WL 361177 at *11 (citing the Iran-United States Claims Tribunal's finding that the "serious infringement" of McKesson's rights as a shareholder "can be attributed beyond doubt" to Iran); *id.* at *7 ("Iran is responsible for the acts of its codefendants. . . ."). In so doing, Iran violated a number of legal duties to McKesson under Pak's Articles of Association, the Treaty, and Iranian statutes. *See* Katirai Op. at 8-20. Thus, contrary to Iran's assertions, it cannot rely on Article 11 to avoid liability under the Civil Responsibility Act for acting "in accordance with the law . . . to safeguard social interests." Katirai 2d Supp. Op. at 6-7. Rather, as has been found by both the Iran-United States Claims Tribunal and this Court, the decisions to cut off dividend payments to McKesson and squeeze out McKesson by the government-controlled majority shareholders were entirely commercial in nature and thus were not undertaken pursuant to any legal authority to safeguard any social interest. *See McKesson 1997*, No. 82-220, 1997 WL 361177 at *11 (citing the Iran-United States Claims Tribunal decision); *id.* at *10 n.17 ("[T]his Court has already determined that the acts at issue here are commercial in nature."); *McKesson 2009*, No. 82-220, 2009 WL 4250767, at *5 (finding that the act of state doctrine did not apply).

11

Finally, the Civil Responsibility Act requires a causal relationship between the defendant's fault and the plaintiff's damage. *See* Katirai Op. at 13. There can be no doubt that the actions of Pak's board, which are attributable to Iran, caused "the more or less irreversible deprivation" of McKesson's property. *McKesson 1997*, No. 82-220, 1997 WL 361177, at *12. Iran's argument that "McKesson caused itself damage" by withdrawing its representatives from the board in October 1981 and refusing to meet in Vienna for settlement negotiations, *see* Iran's Mem. at 28, has already been rejected by this Court. *See McKesson 1997*, No. 82-220, 1997 WL 361177, at *11 (finding withdrawal of representatives irrelevant "given the extent to which McKesson's shareholder rights had been interfered with" and the refusal to negotiate "inconsequential"). With all of the elements thus established, the Court finds that Iran is liable under the Civil Responsibility Act.

Article 3 of the Civil Responsibility Act describes the scope of damages that may be recovered because of injury to property or other rights: "The court will fix the amount of the loss and the method and manner of the compensation with due regard to the circumstances and conditions surrounding the case." Katirai Op. at 23. As explained by McKesson's expert, "the Act contemplates a full recovery of damages suffered because of the wrongful acts." *Id.* Therefore, the Court has the full authority under this Act to award the fair market value of McKesson's interest in Pak, i.e., the unpaid dividends from 1981 and 1982 and its equity investment at the time of the taking. *See id.*; Katirai

12

2d Supp. Op. at 10-11.  Accordingly, under the Civil Responsibility Act, McKesson is entitled to a damages award equivalent to the Court's 2000 ruling, through May 26, 2000.

## III.   Civil Code

Article 308 of the Civil Code of Iran provides relief for the illegal conversion of property, which "consists of taking over the right of another by force."  *See* Katirai Op. at 14.  To establish a claim of conversion, a plaintiff must prove four elements:  (1) a taking of another's property or rights, (2) intent to perform the wrongful act, (3) causation, and (4) damages. *See id.*  McKesson, once again, has easily established each of these elements.  First, Pak and its government shareholders and board members took away McKesson's shareholder rights. *See McKesson 1997*, No. 82-220, 1997 WL 361177, at *12.  Second, depriving McKesson of its shareholder rights, including dividends, "appears to have been done with the object of discriminating against [McKesson]" and "constituted a serious infringement of [McKesson's] right to enjoy the fruits of its holding in Pak Dairy." *Id.* at *2, *11 (quoting the Iran-United States Tribunal decision). Iran again attempts to avoid liability by arguing—again, to no avail—that it was acting pursuant to legal authority in refusing to pay McKesson in any currency.  Third, there can be no dispute that the actions of Pak Dairy's board, which are attributable to Iran, were the cause of McKesson's injury.  Finally, as discussed above, McKesson's damages have been established.

The Civil Code provides that one who has destroyed another's property must replace it with its equivalent or compensate the owner for any injury.  Katirai Op. at 21-

22 (citing Civil Code Articles 301-04, 328, 331). To that end, Iran's main response to McKesson's claim under the Civil Code is that if McKesson were to prevail, it would only be entitled to return of the actual shares, and not their value. *See* Iran's Mem. at 29. This argument, unfortunately, ignores the fact that this Court has already concluded that return of the shares is not a meaningful remedy in this case. *See McKesson 1997,* No. 82-220, 1997 WL 361177, at *12 n.22; *see also* Katirai 2d Supp. Op. at 12 ("Because the Court's prior findings establish an irreversible interference with McKesson's property rights . . . McKesson's loss cannot be remedied simply by returning McKesson's shares."). Instead, in this case, McKesson must be compensated by the value of its interest in Pak as well as the value of the actual or expected dividends of such interest. *See* Katirai Op. at 25. Accordingly, under the Civil Code, McKesson is also entitled to a damages award consistent with the Court's 2000 ruling, through May 26, 2000.

## IV.   Commercial Code

Finally, McKesson asserts a cause of action under the Commercial Code of Iran. Iran in turn does not dispute that McKesson has a remedy under the Commercial Code, to the extent that McKesson seeks damages other than for a taking.[6] *See* Iran's Mem. at 16-17. More specifically, Article 90 of the Commercial Code, as amended on March 15, 1969, requires that at least ten percent of the net profit of a joint stock company be distributed among its shareholders as a dividend. Katirai Op. at 9. Any dividend

---

[6] This Court has already rejected Iran's arguments that the Commercial Code precludes other Iranian law causes of action and that the Iranian government cannot be sued under the Commercial Code. *See McKesson 2009*, No. 82-220, 2009 WL 4250767, at *2 n.4.

declared by the company must be distributed to all the company's shareholders within a certain time frame. *Id.* Accordingly, Pak's repudiation of the rights of McKesson, the minority shareholder, by paying dividends to Iranian shareholders but not to McKesson, violated Pak's obligations under the Commercial Code. *See id.* at 9-10, 17. As it has already been found that Iran was directly responsible for the actions that squeezed McKesson out of its investment and cut off its dividend payments, *see McKesson 1997*, No. 82-220, 1997 WL 361177, at *12, Iran is liable to McKesson under the Commercial Code.

Curiously, although Iran's expert agrees that McKesson would have a cause of action under the Commercial Code for "violation of commercial law and articles of association," he contends that McKesson does not assert such a cause of action. Sanaei Op. at 7. That is simply incorrect. As stated above, minority shareholder oppression is part of McKesson's claims, as is breach of the obligation to pay declared dividends within the time proscribed by law. Iran again attempts to avoid liability by characterizing McKesson's non-receipt of dividends as the result of a sovereign decision to control capital flight and adherence to a come to the company requirement. *See* Iran's Mem. 18-25. Those arguments remain untenable for the same reasons as stated above. Therefore, McKesson is also entitled to judgment under the Commercial Code of Iran.

Iran argues that McKesson's remedy under the Commercial Code is only for recovery of the value of the dividends and not for the fair market value of its entire investment. *See* Iran's Mem. at 25-26. As McKesson's expert explains, however, there

is "no basis under Iranian law or in logic" for limiting the remedies available under the
Commercial Code to just the value of the dividends. Katirai Op. at 27. Rather, "[t]he
rule of *lazarar* [no harm] . . . entitles a court to stop ongoing oppression, to extirpate the
source of oppression and to provide a remedy for an Iranian joint stock company's
repudiation of the rights of one of its shareholders."[7] *Id.* at 28. Considering that
McKesson was deprived of receiving dividend payments, shareholder communications,
and the benefit of other shareholder rights, the Court finds that the extreme nature of the
minority oppression in this case entitles McKesson to damages equal to the full value of
its equity investment in addition to the unpaid dividends. Therefore, under the
Commercial Code, as with the other Iranian statutory causes of action, McKesson is
entitled to a damages award consistent with the Court's 2000 ruling, through May 26,
2000.

## V.      Prejudgment Interest

As the Court has already recognized, customary international law and the Treaty
of Amity which incorporates it provide for prejudgment interest. *See McKesson 2000*,
116 F. Supp. 2d at 40 (quoting Restatement (Third) of Foreign Relations Law § 712).
Furthermore, "Iranian law has adopted the principles of customary international law
concerning the payment of interest as a component of full compensation for the

---

[7] The rule of *lazarar*, a principle of Islamic law, provides that the exercise of legal rights cannot
be a means of causing harm to another. *See* Katirai Op. at 11. This legal principle applies when
enacted laws are not complete or explicit in achieving the goal of full compensation to a party
that was harmed. *See* Katirai 2d Supp. Op. at 9-10.

expropriation of a foreign investment in Iran." Katirai 2d Supp. Op. at 13; *see also id.* at 14-16 (discussing how Articles 515 and 520 of the Civil Procedure Act of 2000, Article 320 of the Civil Code, and the Civil Responsibility Act all provide for "delay damages"). It is abundantly clear that under all four Iranian law causes of action asserted in this case, prejudgment interest or damages for delay of payment are necessary to fully compensate McKesson for its injury.  As I previously stated, "it is hard to imagine . . . that less evidence has ever delayed the awarding of so much, to one so deserving, for so long!" *McKesson 2007*, 520 F. Supp. 2d at 42.

Judge Flannery's 2000 award of pre-judgment interest, which was based upon customary international law and the Treaty of Amity, calculated simple interest at a rate of nine percent through May 26, 2000, the date of that opinion. *See McKesson 2000*, 116 F. Supp. 2d at 40-41.  McKesson filed a motion to reconsider, seeking compound interest, which the Court denied.  *See McKesson 2000*, 116 F. Supp. 2d at 43-49.  On appeal, our Circuit held that, although the Court had incorrectly found that customary international law required simple interest, the Court had nonetheless properly exercised its discretion in applying simple interest. *See McKesson III*, 271 F.3d at 1111-12.  As that award has already been appealed and affirmed, this Court declines to exercise its discretion to modify Judge Flannery's award of simple interest through May 26, 2000.

Determining the interest from May 27, 2000, until the present, however, is an entirely different matter.  Since that time, over a decade ago, Iran has successfully avoided payment of any damages by invoking a come to the company defense that was

entirely devoid of factual support but nonetheless managed to sidetrack the final

resolution of this litigation for quite a few years.  Under Iranian law, this Court is not

constrained to award simple interest, and Iran does not argue to the contrary.  *See* Katirai

Op. at 39.  While permitting compound interest, however, Iranian law does not provide

guidance on when to award it.  Federal common law, in turn, awards prejudgment interest

"to compensate for the loss of use of money due as damages from the time the claim

accrues until judgment is entered, thereby achieving full compensation for the injury

those damages are intended to redress."  *West Virginia v. United States*, 479 U.S. 305,

310 n.2 (1987).  Prejudgment interest at a compound rate is appropriate under federal law

where simple interest is insufficient to make plaintiffs whole.  *See, e.g., Am. Nat'l Fire

Ins. Co. v. Yellow Freight Sys.*, 325 F.3d 924, 938 n.11 (7th Cir. 2003); *Saulpaugh v.

Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993).  Such an approach is entirely

consistent with the Iranian law principle of awarding the victim "full compensation."  *See*

Katirai Op. at 20; *see also* Expert Op. of Judge Stephen M. Schwebel [Dkt. #929-2] at 4

(stating that under the Treaty and customary international law, compound interest is an

appropriate and necessary component of damages in this case).

It is apparent that at this point in time, twenty-eight years after this litigation was

commenced and over a decade since Judge Flannery's initial award, the disparity

between simple and compound interest has grown dramatically.  To award McKesson full

compensation, therefore, it is necessary to award compound interest from May 27, 2000,

until the present day.  The Court previously found, in accordance with our Circuit's law,

that the average prime rate was an appropriate rate under federal law.  *See McKesson 2000*, 116 F. Supp. 2d at 40-41.  Since May 27, 2000, the average prime rate is 7.77%.  Accordingly, the Court shall assess 7.77% interest, compounded annually from May 27, 2000, until November 19, 2010, on $20,071,159.14, which is the total value of McKesson's equity interest and unpaid dividends from 1981 and 1982 plus prejudgment interest through May 26, 2000.  Compound interest during that time period totals $23,909,046.44.  Therefore, the Court will now enter final judgment for McKesson as a matter of Iranian law and award McKesson $43,980,205.58 in total damages and prejudgment interest.  I will leave for another day in the near future, however, the amount of additional legal fees and expenses, if any, Iran owes McKesson's counsel.

## CONCLUSION

For all of the above reasons, Iran is liable under the Treaty of Amity as a matter of Iranian law, as well as the Civil Responsibility Act of Iran, the Civil Code of Iran, and the Commercial Code of Iran.  Accordingly, the Court enters judgment in favor of McKesson and awards $43,980,205.58 in damages and interest.

RICHARD J. LEON
United States District Judge